**101 STUDIO, INC., and Anthony Ruta, Plaintiff,**

v.

**William BARDAL, Individually and as Director of Midtown Planning, et al., Defendants.**

**No. 73 Civ. 3606.**

United States District Court, S. D. New York.

Oct. 11, 1974.

Kassner & Detsky, New York City, (Herbert S. Kassner, New York City, of counsel), for plaintiffs.

Adrian P. Burke, Corp. Counsel, City of New York, (Renee Modry, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

OWEN, District Judge.

Plaintiffs, 101 Studios Inc., a commercial photographic studio, and its sole stockholder and president, Anthony Ruta, seek a preliminary injunction pursuant to Fed.R.Civ.P., Rule 65 enjoining the defendants, various officials of the City of New York, from enforcing the licensing provisions of Article I of Title B, Chapter 32 of the Administrative Code of the City of New York[1] with respect to their place of business, on the ground that said licensing regulations are unconstitutionally vague on their face in violation of the First and Fourteenth Amendments, and that the information sought on licensing applications pursuant to these regulations violates plaintiffs' constitutional right of privacy.

Plaintiffs' business has been in operation for over eight years. It maintains fully equipped studios which it rents to member photographers by the hour. It employs about a dozen part-time models who pose for club members and whose work, 101 Studios insists, and it is not contended otherwise, are strictly confined to modeling. Such a business is, according to the Department of Consumer Affairs, a "public amusement" within the meaning of § B32–1.0 of the Administrative Code requiring a license for operation. Plaintiffs have never applied for a license.

It appears from the papers that an employee of 101 Studios, Sidney Levenson, was served a summons in March 1973, for operating a place of public amusement without a license. On April 18, 1973, Levenson was arrested on the same charge which was dismissed the same day. On April 24, 1973, plaintiffs brought an action in New York State Supreme Court. According to defendants, plaintiffs agreed to discontinue the action and to apply for a license, while defendants agreed to allow plaintiffs to operate freely until a decision was rendered on the application. Plaintiffs made no such application. Thereafter on June 8, 1973, Levenson was again arrested and on June 22, 1973, Ruta was arrested. The charges in both cases were dismissed on July 6, 1973 and no further measures have been taken by defendants since that time.

Plaintiff commenced the present action on August 20, 1973. His application on that date for a temporary restraining order was denied by Judge Wyatt. However, defendants have agreed to take no action against plaintiffs until there has been a judicial determination of its right to require licensing of plaintiffs' establishment, and has further agreed that should plaintiffs be required to apply for a license, they would take no action against plaintiffs during the pendency of the license determination.

Plaintiffs argue that a decision in their favor is mandated by the holding of 414 Theatre Corp. v. Murphy, 499 F.2d 1155 (2d Cir. 1974) affirming 360 F.Supp. 34 (S.D.N.Y.1973). I cannot agree. That decision held that Article 1 of Title B, Chapter 32, as it then stood, was unconstitutional as applied to the owner of an establishment exhibiting "peep-show" films because the language of the Code left the dissemination of material protected by the First Amendment to the unbridled and unguided discretion of a city commissioner.[2]

1. Relevant portions of both Title B and Title A, Chapter 32 of the Administrative Code of the City of New York are set forth in the appendix.

2. See also People v. Mitchell, 74 Misc.2d 1053, 346 N.Y.S.2d 495 (N.Y.City Crim.Ct. 1973), which held the same sections unconstitutional on their face as violative of the First Amendment. I note that there appears to be nothing in the recent amendments to the administrative code which would sufficiently narrow the commissioner's discretion to adequately protect First Amendment rights and therefore change the result reached in 414 Theatres, supra. See

■ Unlike that case, plaintiffs have demonstrated no First Amendment activity that is inhibited by the statute. The business is not itself engaged in the dissemination or communication of ideas or information. 101 Studios argues, however, that it is engaged in "a speech related activity in that professional as well as amateur photographers utilize the premises for producing photographic images, pictures, for sale, reproduction, exhibition and other forms of dissemination." Plaintiffs further contend that theirs is a speech related activity equivalent to the writing of a book, the printing of a magazine, the sculpting of a statue or the painting of an oil painting falling within the protection of the First Amendment. The analogy to 101 Studios is, however, more accurately one of the developer of film used in a motion picture or the landlord of a writer. The painter and sculptor are, if anything, analogous to the customers of 101 Studios, whose First Amendment rights plaintiffs are in reality attempting to assert. Since there is no reason for supposing that any inhibition to the customers' First Amendment rights cannot be protected by the customers themselves, see Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and plaintiffs derive no cognizable derivative injury to their First Amendment rights, see e. g. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), I conclude that plaintiffs lack standing to assert these First Amendment arguments. Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943); United States v. Raines, 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L. Ed.2d 524 (1960); Laird v. Tatum, 408 U.S. 1, 13 n. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

Plaintiffs, however, clearly do have standing to raise their "vagueness" claims under the due process clause of the Fourteenth Amendment. In this regard, plaintiffs allege that their busi-

ness is not a "public amusement" as that term is defined in § B32–1.0 and hence they are not required to apply for a license. They further argue that if their business were construed to be a "public amusement", the regulation does not provide them or any reasonable person with sufficient notice that they must apply for a license and hence they could not be criminally prosecuted for failure to apply for such license consistent with due process. Further, plaintiffs claim that the regulation's standards which were insufficient in *414 Theatres, supra,* as to the First Amendment, similarly require invalidation of the public amusement licensing scheme in that they leave such unbridled discretion in the Commissioner as to unconstitutionally deprive plaintiffs of their right to conduct a business. Defendants argue that plaintiffs' business is clearly a "public amusement" under New York Law and that the licensing regulations as so interpreted in no way violate the Fourteenth Amendment.

■ Since I need not reach the constitutional issues raised by plaintiffs if 101 Studios' business is not one of a "public amusement" within the meaning of § B32–1.0 and since the definition of that term as it is applied to a business such as plaintiffs' is unclear under New York law, I feel that abstention is warranted in this case. On the one hand, there are three recent decisions in the New York Courts which indicate a broad construction of the term "public amusement". Although perhaps distinguishable, one might conclude that a photographic studio advertising the availability of live models was a "public amusement".[3] City of New York v. Bullard, N.Y.L.J., Dec. 3, 1973, at 2, col. 4 (Sup.Ct.); City of New York v. Pink Pussy Cat, Inc., N.Y.L.J., Dec. 3, 1973, at 2, col. 3 (Sup.Ct.); City of New York v. Cohen, N.Y.L.J., Sept. 20, 1973, at 2, col. 2 (Sup.Ct.).

---

the appendix for the newly enacted provisions of Title A of Chapter 32 of the Administrative Code.

3. See § 773–3.0 of Title A of Chapter 32 in the appendix which requires a liberal construction of the licensing regulation.

On the other hand, the fact that the New York courts have dismissed the various arrests of plaintiff Ruta and his employee, indicate that at least some New York courts have doubts as to the Commissioner's interpretation of the term "public amusement". According to plaintiff, one judge, in dismissing stated that he doubted a photographic studio needed to be licensed. In fact the Commissioner herself interpreted these dismissals as judicial disagreement with her position.

Given this contradictory picture of New York law, I feel it is the better practice to await a definitive ruling by New York Courts on this subject which might obviate the need to decide questions of constitutional law. Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1972). An additional circumstance favoring abstention is the fact that the Commissioner has stated that she will take no action against plaintiffs until the final resolution of the issues raised in this action. Therefore, plaintiffs will be in no way harmed by the delay caused by the necessity to institute state court proceedings. See Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L. Ed. 1480 (1949). Consequently, in my discretion, I abstain herein while plaintiff 101 Studios, within a reasonable time, commences an action in the New York State courts or in the alternative applies for a license.[4] I will continue to retain jurisdiction of this action rather than dismiss. Zwickler v. Koota, 389 U.S. 241, 245, n. 4, 88 S.Ct. 391, 19 L. Ed.2d 444 (1967). However, until such time as further consideration is appropriate, the action is placed on the suspense docket of this Court.

4. Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) is not to the contrary. That case deals with the doctrine of "comity" or "equitable restraint", an en-

## APPENDIX

*Be it enacted by the Council as follows:*

Section 1. Title A of chapter thirty-two of the administrative code of the city of New York is hereby repealed and re-enacted to read as follows:

### TITLE A

### LICENSE ENFORCEMENT LAW
of 1973

§ 773–1.0. The Council finds that for the protection and relief of the public from deceptive, unfair and unconscionable practices, for the maintenance of standards of integrity, honesty and fair dealing among persons and organizations engaging in licensed activities, for the protection of the health and safety of the people of New York City and for other purposes requisite to promoting the general welfare, licensing by the department of consumer affairs is a necessary and proper mode of regulation with respect to certain trades, businesses and industries. The council finds further that, in order to secure the above-mentioned purposes, and generally to carry out responsibilities for supervising and regulating licensed activities, trades, businesses and industries, the commissioner of consumer affairs requires powers, remedies and sanctions which are equitable, flexible and efficient. Finally, the council finds that sanctions and penalties applied by the commissioner and by the courts for the violation of laws and regulations by individuals and organizations engaging in various licensed activities, trades, businesses and industries, must be sufficient to achieve these above-mentioned purposes of licensing.

§ 773–3.0 Construction of this title and other titles of this chapter.—The provisions of this title and other titles contained in this chapter shall be liberally construed in accordance with the leg-

tirely separate consideration from that of "abstention" under the *Pullman* doctrine. 415 U.S. at 474–75, n. 21–22, 94 S.Ct. 1209.

islative declaration of the city council set forth in section 773–1.0.

§ 773–4.0 Powers of the commissioner of consumer affairs with respect to licensing.—a. The commissioner shall have cognizance and control of the granting, issuance, transferring, renewal, denial, revocation, suspension and cancellation of all licenses issued under this chapter and under all other laws conferring such powers upon him. The commissioner or the commissioner's designee shall collect all fees for all such licenses and permits and shall otherwise enforce the provisions of this chapter.

b. The commissioner shall as he determines necessary and appropriate, promulgate, amend and rescind regulations and rules.

1. to carry out the powers and duties of the department;

2. to prevent and remedy fraud, misrepresentation, deceit and unconscionable dealing and to promote fair trade practices by those engaging in licensed activities;

3. to require adequate disclosure by those engaging in licensed activities of both the terms and conditions under which they perform licensed activities, adequate disclosure of the true names or true corporate names of licensees, and adequate disclosure of applicable local, state and federal law pertinent to consumers' interests regarding the conduct of activities licensed under this chapter;

4. to require that licensees keep such records as he may determine are necessary or useful for carrying out the purposes of the chapter and, except as specifically set forth in this chapter, retain them for three years;

5. to ensure that all persons and organizations licensed under this chapter have made appropriate financial disclosure, and that the premises complies with all legal requirements necessary to engage in the licensed activity;

6. with respect to licensed activities, to protect the health, safety, convenience and welfare of the general public; and

7. to ensure that those engaging in licensed activities do not discriminate against any person on the basis of age, sex, race, color, national origin, creed or religion in violation of city, state or federal laws.

## ARTICLE 1

### EXHIBITIONS AND PERFORMANCES

§ B32–1.0 License required.—a. It shall be unlawful for any person to operate any place or premises of public amusement or sport, indoor or outoor, or to exhibit any performance of public amusement or sport in any such place or premises, without a license therefor, upon payment of such fees as may be prescribed by the commissioner, and upon such terms and conditions as he deems necessary for proper regulation and good order.

§ B32–4.0 Conditions of license.—Such licenses, in the discretion of the commissioner, may be subject to provisions and conditions which, in his judgment, may be essential for the welfare and benefit of the people of and visitors to the city, including provisions and conditions respecting the tickets or other tokens, entitling their holders to admission to such places, and respecting the hours of opening and closing thereof.